IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Richard P. Matsch

Civil Action No. 12-cv-2585-RPM

RAMZI YOUSEF,

 Applicant,

v.

UNITED STATES OF AMERICA,

 Respondent.

---

## MEMORANDUM OPINION AND ORDER

---

The objective of this civil action, considered as an application for a writ of habeas corpus under 28 U.S.C. § 2241, is to discover the factual support for Respondent to continue subjecting Applicant Ramzi Yousef to Special Administrative Measures ("SAMS") as part of his imprisonment at the U.S. Penitentiary, Administrative Maximum ("ADX") in Florence, Colorado.  SAMs are special conditions and restrictions of confinement pertaining to where a prisoner will be housed, to whom he may communicate, and how that communication may occur.  See 28 C.F.R. § 501.3(a).  By regulation, the Director of the U.S. Bureau of Prisons ("BOP"), upon the direction of the U.S. Attorney General, may authorize a Warden of a federal penitentiary to impose SAMs upon a federal prisoner if there is a finding "that there is a substantial risk that [the] prisoner's communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons."  Id.  Yousef was first

subject to SAMs in August 1996, before his conviction, upon a finding by then-Attorney General Janet Reno that he fit that standard.  His SAMs have been renewed every year since.

Respondent United States filed an Answer to Yousef's habeas petition, attaching documents which are under a Level 1 restriction.  A hearing was held on January 29, 2014, part of which was conducted in a closed courtroom; the transcript of that portion has also been sealed.  At the hearing, Yousef's counsel made it clear that Yousef is not challenging the constitutionality of SAMs or the conditions of confinement that have been imposed on him.  This is not an Eighth Amendment case.  Yousef's claim is that the reasons given in renewing his SAMs are repetitive and inadequate to permit him to challenge their sufficiency, which denies him the protection of the due process clause of the Fifth Amendment.

To sustain his procedural due process claim, Yousef must establish:  (1) that he has been deprived of a constitutionally-protected liberty interest; and (2) that the procedures employed by Respondent in depriving him of that interest were constitutionally insufficient.  See Swarthout v. Cooke, 131 S. Ct. 859, 861 (2011).

Prisoners retain only a "narrow range of protected liberty interests," Rezaq v. Nalley, 677 F.3d 1001, 1011 (10th Cir. 2012), which are infringed when a prisoner's conditions of confinement are "atypical" and he must endure a "significant hardship in relation to the ordinary incidents of prison life."  Wilkinson v. Austin, 545 U.S. 209, 222-23 (2005). Determining whether conditions are atypical and impose a significant hardship requires a "fact-driven assessment that accounts for the totality of conditions presented by a given inmate's sentence and confinement." Rezaq, 677 F.3d at 1012.  Relevant, non-dispositive factors in that assessment include whether:  (1) the restriction relates to and furthers a

2

legitimate penological interest; (2) the conditions of confinement are extreme; (3) the restriction increases the duration of confinement; and (4) whether the restriction is indeterminate and of significant duration.  Estate of DiMarco v. Wyo. Dep't of Corrs., 473 F.3d 1334, 1342 (10th Cir. 2007).

To satisfy the first factor, the government must show a "reasonable relationship" between the challenged restriction and a legitimate penological interest.  Rezaq, 677 F.3d at 1014.  In making that showing, prison officials are permitted to rely not only the prisoner's post-incarceration conduct, but also on the nature of the underlying crime for which the prisoner was convicted.  See Sattar v. Holder, No. 07-cv-02698-PAB, 2012 WL 882401, at *8 (D. Colo. Mar. 15, 2012) (citing cases).  Addressing national security risks posed by inmates with terrorist ties and sympathies is a legitimate, "uniquely federal penological interest." Rezaq, 677 F.3d at 1014.  There is no question that Yousef is one such inmate.  Yousef led the plot to bomb the World Trade Center in 1993.  He recruited conspirators, directed the construction of the bomb, and, when the time came, he personally drove the bomb to the World Trade Center's parking garage, set the bomb's timer to detonate, and fled the complex.  The high-profile nature of Yousef's crimes has made Yousef a motivating force for international terrorists (including Ayman al-Zawahari, head of al Qaeda), who invoke Yousef's name in propaganda statements and acts of violence.  [See Doc. 39 at 10-11.] Active terrorists have also attempted to contact Yousef during his incarceration.  [Id. at 11-12.]

Respondent's position is that the Court must defer to the Executive Branch in matters affecting national security.  While it is difficult to accept that proposition, particularly in matters of liberty, the Supreme Court's opinion in Holder v. Humanitarian Law Project, 130

S. Ct. 2705, 2727 (2010), supports it.  At any rate, such deference is due in this case given the convictions and sentences imposed on Ramzi Yousef following a full criminal trial, and given Yousef's own statements of animosity towards the United States.  Accordingly, Respondent has a legitimate penological interest in restricting and monitoring Yousef's interactions and communications with persons inside and outside of ADX.  The SAMs bear a "reasonable relationship" to that interest.  The first DiMarco factor weighs against recognizing a liberty interest.

The second DiMarco factor looks at whether the challenged conditions are "extreme," DiMarco, 473 F.3d at 1342, an inquiry guided by comparing the conditions the inmate challenges to (1) the type of nonpunitive confinement routinely imposed on inmates serving comparable sentences, and to (2) the conditions deemed relevant by the Supreme Court in Wilkinson.  Rezaq, 677 F.3d at 1014.  Yousef's current SAMs [Doc. 67, Ex. 1] impose a number of restrictions, including:

- Correspondence:  Yousef's non-legal contacts are limited to his immediate family, consisting of his wife and two daughters, his mother and father, and eleven siblings. Yousef may exchange correspondence with them, with no limits on how long or frequent those letters may be.  Federal Bureau of Investigation ("FBI") Joint Terrorism Task Force ("JTTF") personnel monitor and review the letters.  Yousef may also exchange an unlimited amount of correspondence with his attorney, which is unmonitored, and with representatives of the federal government.  Yousef may request that additional persons be approved to communicate with him, but he has not done so.

- <u>Visitors:</u>  Yousef's immediate family and his attorney may visit him at ADX.  There is no limit on the number of visits he may have with that limited group of people.  The visits are non-contact.  Yousef is prohibited from receiving other visitors.

- <u>Telephone Calls:</u>  Yousef is allowed at least one 15-minute nonlegal telephone call per month, and he is currently allowed three such calls per month because he is in Phase Two of the ADX Special Security Unit Program.  JTTF personnel monitor these calls.

- <u>Contact with News Media:</u>  Yousef is explicitly prohibited from contacting the news media, either directly or through a third party.

- <u>Group Prayer:</u>  Yousef is prohibited from engaging in group prayer with other inmates.

- <u>Reading Materials:</u>  The BOP may restrict the publications (newspapers, periodicals, and books) Yousef can receive.  The BOP has not rejected any of Yousef's publication requests.  Yousef can receive the current day's edition of *USA Today*.  He can also access approximately 900 titles from the H Unit leisure library by submitting a verbal or written request to ADX staff, who then deliver the requested material to his cell.

- <u>Television and Radio:</u>  Yousef is authorized to have television and radio privileges, in accordance with standard BOP policies and procedures.  He has a television set in his cell that offers access to 55 television channels and to closed circuit institutional programming.  He may also listen to FM radio and digital music channels.

As a consequence of his SAMs, Yousef is housed in the H Unit of ADX.  [Doc. 40 ¶ 3.] The following information concerning H Unit conditions comes from Declarations of former-Associate Warden Shon M. Kuta [Doc. 40] and Associate Warden Stephen D. Julian [Doc. 80, Ex. 2]:

- Cell:  Yousef currently resides by himself in a cell that is approximately 80 square feet in size.  Yousef's cell door is composed of hollow steel and is 50 millimeters thick. The door contains a 5-inch-x-18-inch tempered glass window facing the H Unit housing range.  Yousef has a broad view of H Unit from the window in his cell door. The door also has a 3-inch-x-4-inch "speak port," which allows Yousef to communicate with inmates in the cells next to and across the range from his cell, and with ADX staff and other inmates passing by.  Yousef's cell contains a 42-inch-x-7-inch window that gives him a view to the outside.  He can see one of the outside recreation areas for H Unit inmates, the exterior of both levels of the ADX facility, as well as the sky, which allows him to see sunlight and other elements (rain, snow, clouds, and so forth).  He can also control the lights in his cell.

- Recreation:  H Unit inmates receive out-of-cell recreation every day.  Sessions typically last 1.5 hours.  Recreation alternates between indoor and outdoor recreation Monday through Friday.  On Saturdays and Sundays, recreation is held outdoors.  A typical two-week recreation schedule for an H Unit inmate is five days of outdoor recreation and two days of indoor recreation one week, followed by four days of outdoor recreation and three days of indoor recreation the next week.  Thus, Yousef receives approximately 13.5 hours of outdoor recreation and 7.5 hours of indoor

6

recreation in a two-week period, for a total of 21 hours of out-of-cell recreation every two weeks, or 10.5 hours of out-of-cell recreation per week.

- o <u>Outdoor recreation:</u>  An inmate in an outdoor individual recreation area has full visual access to the entire recreation yard and the inmates in the other individual recreation areas.  The individual recreation areas are adjacent to each other.  Up to six inmates can participate in outdoor recreation at the same time.  Many inmates spend most of their recreation time talking with each other.   Yousef is often seen talking with other inmates during outdoor recreation.

- o <u>Indoor recreation:</u>  Indoor recreation is conducted in two separate recreation areas inside the housing unit.  Each individual recreation area is approximately 160 square feet and contains a 3-foot-x-5-foot tempered glass window. Inmates who are in the indoor recreation areas at the same time can see and hear each other.   They frequently work out together by doing the same exercises at the same time and counting repetitions together.

- <u>Job</u>:  Yousef has held a paid job as a range orderly for H Unit since October 8, 2013. In that capacity, he is responsible for maintaining the cleanliness of a housing range on which six H Unit inmates live.  He sweeps, mops, and buffs the floors; cleans windows; and dusts.  ADX staff supervise him visually; he works without physical restraints.  He is permitted to talk to inmates while he is working.  He works a minimum of 3-4 days each week for at least an hour per day; sometimes he works more days per week and works longer shifts.  Thus, Yousef's orderly job gives him at least 4 hours of out-of-cell time per week.

- Extracurricular Activities:  Yousef can participate in wellness programs, weekly leisure games via the ADX closed circuit television system, weekend "brain teaser" games, arts and crafts, a weekly movie program, and special holiday activities.  These are the same programs and activities that are available to non-SAMs inmates at the ADX.

- Law library:  Yousef has access to the H Unit law library.  The law library is the size of approximately two inmate cells (~160 square feet), has a computer with access to LexisNexis, and has a view of the unit range and a window with a view of the outside. Inmates typically use the law library for two-hour periods.

- Interaction with ADX staff and other inmates:  Yousef is allowed to communicate with other inmates and staff during pre-designated times, primarily during recreation. Yousef is also permitted to speak to H Unit inmates throughout the day, either cell to cell or during other times when he is out of his cell (*e.g.*, working as an orderly, using the law library, walking to and from the shower).  He can ask to speak to a staff member at any time.

At the January 2014 hearing, Yousef's counsel emphasized that Yousef has had no physical contact with another human being, even shaking hands, for over 18 years. Respondent has submitted evidence showing that, for the most part, group activity and social visits for all H Unit inmates are non-contact.  [See Doc. 39, Ex. D.]  As for Yousef's conditions of confinement more generally, there has been no showing that they are materially more restrictive than those faced by other prisoners in H Unit.  Yousef, because he is in

Phase Two of ADX's Special Security Unit Program, has more privileges and out-of-cell time than those H Unit inmates in Phase One.

Respondent has also presented evidence showing that the conditions of confinement in H Unit are substantially similar to the conditions for non-SAMs inmates in the ADX General Population Unit.  [See id.]  Other judges of this District have concluded that the conditions in the ADX General Population Unit are not extreme.  See, e.g., Saleh v. Fed. Bureau of Prisons, Nos. 05-cv-02467-PAB, 06-cv-01747, 07-cv-00021, 2010 WL 5464294 (D. Colo. Dec. 29, 2010); Georgacarakos v. Wiley, No. 07-cv-01712-MSK, 2010 WL 1291833 (D. Colo. Mar. 30, 2010).

The conditions imposed by Yousef's SAMs are less extreme than the conditions of the Ohio Supermax facility at issue in Wilkinson, where "almost all human contact [was] prohibited, even to the point that conversation [was] not permitted from cell to cell; the light, though it [could] be dimmed, [was] on for 24 hours; exercise [was] for 1 hour per day, but only in a small indoor room."  545 U.S. at 223-24.

For these reasons, the second DiMarco factor weighs against recognizing a liberty interest.

The third DiMarco factor assesses whether the conditions increase the duration of an inmate's confinement, DiMarco, 473 F.3d at 1343, a particularly important consideration in the Wilkinson Court's analysis.  See 545 U.S. at 223-24 (placement at Ohio supermax disqualified inmate from parole consideration).  Here, the SAMs do not affect Yousef's sentence in any way—not its duration, his parole eligibility, or his good-time credits.  This weighs against finding that the SAMS implicate a liberty interest.  See Rezaq, 677 F.3d at 1015-16 (ADX placement did not affect parole eligibility or term of confinement).

The final <u>DiMarco</u> factor assesses the duration of the conditions in tandem with whether the duration is indeterminate.   473 F.3d at 1342.   The interplay between duration and indeterminacy was demonstrated in <u>Rezaq</u>, which dealt with four inmates who were convicted of terrorism-related offenses and housed in ADX's General Population Unit.   One plaintiff, Rezaq, had been housed there for approximately thirteen years.   <u>See</u> <u>Rezaq v. Nalley</u>, No. 07-cv-02483-LTB-KLM, 2010 WL 5157317, at *5 (D. Colo. Aug. 17, 2010) (Mix, M.J.).   Rezaq argued that the duration itself was atypical and significant.   <u>See</u> <u>Rezaq</u>, 677 F.3d at 1016.   Considering duration together with indeterminacy, the Court concluded that the fourth <u>DiMarco</u> factor weighed against finding a liberty interest because, although Rezaq and the other plaintiffs had been housed at ADX for a significant duration, "they were given regular reevaluations of their placement in the form of twice-yearly program reviews," which meant their placement was not indeterminate.   <u>Id.</u>   Under <u>Rezaq</u>, therefore, regular confinement reviews mitigate the atypicality and significance of the confinement's duration.

Here, Yousef has been subject to SAMs for 18 years—five years longer than Rezaq. Indeed, the duration of Yousef's SAMs is longer than all of the ADX-confinement durations that have been considered as part of a liberty-interest analysis in this jurisdiction.   <u>See</u> <u>Gambina v. Fed. Bureau of Prisons</u>, No. 10-cv-02376-MSK, 2013 WL 791428 (D. Colo. Mar. 4, 2013) (10 years in ADX General Population Unit); <u>Georgacarakos v. Wiley</u>, No. 07-cv-01712-MSK, 2010 WL 1291833 (D. Colo. Mar. 30, 2010) (7 years in ADX General Population Unit); <u>Sattar</u>,   2012 WL 882401 (almost 5.5 years of SAMs); <u>Jordan v. Fed. Bureau of Prisons</u>, 191 Fed. Appx. 639, 651 (10th Cir. 2006) (almost 5 years in administrative segregation); <u>Allmon</u>, 2011 WL 4501941 (almost 4 years in H Unit). Nonetheless, Yousef's SAMs are not indefinite.   A determination that an inmate should be

subject to SAMs is effective for no longer than a year, at which point that determination must be reviewed.  See 28 C.F.R. § 501.3(c).  In addition to the annual SAMs review, Yousef, like the inmates in Rezaq, is given a twice-annual program review to determine his placement in the Special Security Unit Program.  That process gives Yousef another opportunity to raise any issues he may have with his confinement, including his SAMs.  Information from the Program Review is taken into account when the SAMs review takes place.  Because Yousef's conditions are reviewed at least three times per year, they are not indefinite.  Cf. Wilkinson, 545 U.S. at 224 (review of conditions only once per year rendered conditions practically indefinite).  The fourth DiMarco factor weighs slightly against Yousef.

Accordingly, the Court concludes that Yousef has not shown that his conditions of confinement are so atypical and impose such a hardship as to infringe upon the limited liberty left to him under his sentences.

Even if Yousef had a liberty interest implicated here, the relief he requests is not obtainable from this Court.  Initially, his request is for discovery, including depositions of those with decision-making authority regarding SAMs renewal.  Assuming that relief is granted, it is unclear what the next step would be.  Presumably, Yousef would seek an opportunity to proffer information contradicting what Respondent provides as justification for its actions.  What then?  Would this Court weigh the contradicting information?  By what standard?

Fortunately for Respondent, the Court need not reach the question of whether the SAMs renewal procedure comports with the Fifth Amendment.  The Court recognizes that a full adversarial proceeding is not required in this context, but the evidence submitted indicates that the SAMs renewal process, while adorned with certain formalities customarily attending

11

meaningful review, is solely within the discretion of Department of Justice personnel responsible for investigating, prosecuting, and now imprisoning Yousef.   There is no one within the Executive Branch who may be expected to contradict the conclusion that Yousef's SAMs should continue.   That is offensive to traditional values of fairness and transparency but this Court may neither address nor remedy it here.

Upon the foregoing, it is

ORDERED that Ramzi Yousef's Application for Writ of Habeas Corpus is denied and this civil action is dismissed.

Dated:  May 13, 2014.

BY THE COURT:

s/Richard P. Matsch

_____
Richard P. Matsch
Senior District Judge